**Andrew HAWKINS et al., Plaintiffs,**

v.

**TOWN OF SHAW, MISSISSIPPI, et al., Defendants.**

**No. DC 6737–K.**

United States District Court
N. D. Mississippi,
Delta Division.

Sept. 18, 1969.

Reuben V. Anderson, Jackson, Miss., Jonathan Shapiro, New York City, for plaintiffs.

Ancil L. Cox, Jr., Cleveland, Miss., William Allain, Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this suit plaintiffs, who bring a class action for Negro citizens of the Town of Shaw, Mississippi, seek injunctive relief against defendants, the Town's Mayor, Clerk and five Aldermen,[1] under 42 U.S.C. § 1983, to restrain defendants from discriminating because of race and poverty in providing the inhabitants with certain municipal services, namely: street paving and street lighting, sanitary sewers, water mains and fire hydrants, and surface water drainage.[2] Defendants entered a denial to the charge that disparity of municipal

---

1. Originally plaintiffs also joined as a defendant the Town of Shaw, a municipal corporation, which was dismissed from the suit pursuant to Memorandum Opinion of this court dated July 12, 1968, concluding that injunctive relief was not obtainable against a municipal corporation under § 1983.

2. At entry of pre-trial order, plaintiffs conceded that municipal sidewalks, curb and gutters and garbage collection were no longer an issue in the case.

services afforded to the town's inhabitants was the result of racial or economic discrimination. Following the adoption of a pre-trial order, a three day evidentiary hearing was conducted.

Incorporated in 1886, the Town of Shaw consisted originally of one square mile located in Bolivar County, Mississippi. Its territorial limits were not changed until 1965 when new subdivisions were added to the south and east of the original town extending into Sunflower County. The municipality is largely surrounded by Delta farms and plantations and its economy is almost wholly oriented to agriculture. The town's present population is estimated to be approximately 2500 persons, of which 1500 are Negroes and 1000 whites. There are approximately as many Negro citizens who are qualified to vote as there are white voters. The town's population was for years relatively static, showing little gain for the twenty year period, 1940–1960.[3]

Operating under a Code charter adopted pursuant to §§ 3374–34 et seq. of the Miss.Code of 1942, the town elects its Mayor, Clerk and Board of Aldermen to serve for terms of four years. Because of deaths and resignation, only two of defendant Aldermen have remained in office since the inception of their terms in July 1965.

There are various patterns of residential neighborhoods in the town. In some instances white and Negro residents live on the same streets, yet in other instances, particularly in the oldest and newest subdivisions, there are separate white and Negro neighborhoods. A significant portion of the Negro population resides in the town's peripheral or outer area, with substantial numbers of white people residing near the town's business or commercial center. Prior to 1965, many years had elapsed since the dedication of any new residential subdivisions for either race. Some of the older Negro neighborhoods were in subdivisions laid out many years ago, without zoning regulations, which resulted in houses being erected on exceedingly small lots abutting upon dedicated streets and alleys of inadequate narrow width. To some extent, the older white neighborhoods suffer from the same planning deficiency.

The town has sought to provide its inhabitants certain services, such as street paving and street lighting, a system of surface water drainage, water mains with fire hydrant protection, and since 1963 a sanitary sewerage system. The town's services and facilities are paid from revenues derived by imposition of ad valorem taxes and the sale of water and electricity to its citizens. There are no bonds outstanding, and the town has a $145,000 operating surplus.

*Street paving.* Six different paving projects, financed solely out of general revenues and without special assessments, have occurred at irregular intervals during the past 23 years. Of the approximately 11.8 miles of residential streets in the town, about one-half traverse white neighborhoods and one-half serve Negro neighborhoods. Some streets in both types of neighborhoods are not hard surfaced, but almost all those are gravelled. The streets yet remaining unpaved are largely those in the peripheral or outer areas of the town furthest removed from the central or business section. Initially, concrete paving was afforded to those streets serving commercial and industrial interests and to the areas nearest the town's center. In some cases this resulted in more street paving in white than Negro neighborhoods, but the paving actually done in the municipality was on the basis of general usage, traffic needs and other objective criteria. Residential neighborhoods not facing principal streets or thoroughfares long remained unpaved, regardless of their character as white or black neighborhoods. Also, these heavily traveled streets were later repair-

---

3. The official 1960 census counted 2062 residents of Shaw, consisting of 1327 Negroes, 724 whites and 11 others.

ed and resurfaced in subsequent asphalt paving programs. The town employs a consulting engineer to study street improvement programs and make recommendations to the Mayor and Board of Alderman for priority of additional street paving projects. Modern street paving, beginning in 1956, included the paving that year of at least six streets located in predominantly black neighborhoods.[4] In 1960, involving a small paving project, Doran Street was paved to benefit both black and white residents. The 1966 paving program included asphalting of Scott and Gale Streets in Negro neighborhoods, several streets in white neighborhoods, and resurfacing again of the older, more heavily traveled downtown streets. In 1967 street paving included, within Negro neighborhoods, the resurfacing of Gale Street, new paving on Scott, Lampton, Buckhalter and Cleveland Streets in the northeast section of the town. In the 1968 paving project, completed since this suit was filed, three additional Negro neighborhood streets, Rogers, Lipe and Kelly, in the same northeast sector have been paved with asphalt.[5]

The evidence shows that all street paving since 1956 has been with double surface asphalt of like quality in all neighborhoods and it must, for proper maintenance, be resealed every five years.

*Street lights.* The evidence shows that the town has ample lighting provided for the streets; that for the commercial streets and principal thoroughfares such lighting is provided by high intensity mercury vapor fixtures; that in some areas largely occupied by white residents the lighting fixtures house medium intensity mercury vapor lamps, while in the outlying and largely Negro neighborhoods bare bulb lighting is predominantly used. The brighter lights are provided for those streets forming either a state highway, or serving commercial, industrial or special school needs, or otherwise carrying the heaviest traffic load. While the more powerful equipment, only recently installed, does provide superior lighting, there is no showing that the lighting provided by bare bulbs is practically inadequate or that an insufficient number of such lights has been erected, or that detriment of any kind has been sustained by the town's inhabitants, white or Negro, as the result of inferior or inadequate street lighting.

*Sanitary sewers.* Prior to 1963 the town had no municipal sanitary sewerage system, and its more prosperous inhabitants relied upon septic tanks and privately installed facilities. The greater portion of the Negro families were without indoor plumbing and open ditch sewage existed, to a large degree, throughout the town. In 1963 a modern system complete with lagoon was constructed with drainage lines routed to practically all of the white residential areas as well as the more recent Negro subdivisions having better housing and indoor toilet facilities. Since 1965 the central sewerage system has been extended into various additional Negro neighborhoods. The only "Negro" areas presently remaining unserved by sanitary sewers are sections described generally as the Reeder Addition (Bryant and Dorsey

4. White Oak Street from Dean Boulevard south, Gale Street from Bayou to north corporate limits, Jackson Street, Kentucky Street, Woodlawn Street, Faison Street (one block).

5. The three Negro neighborhoods of greatest size with yet unpaved streets are: (1) Promised Land Addition in the southwest section, whose streets have not been paved because of the necessity for first installing new water mains on the rights of way; (2) Reeder Addition located in the northwest quadrant of the town (Bryant Street, Dorsey Street and other nearby unnamed streets) whose dedicated streets are too narrow to permit surfacing without acquiring additional right of way from abutting property owners); and (3) the approximate west half of Johnson Addition (northeast quadrant) dedicated in 1891 in small lots abutting extremely narrow streets, again rendering asphalt paving undesirable without additional right of way. Substandard housing exists throughout the entire area.

Streets), Canal Street from Gale to the railroad, South Elm extended (1000 feet) and Rogers Street east of Highway 61. Part of the problem in reaching all older unserved areas has been the necessity for bringing this service into newer subdivisions developed for both races and brought into the town, as it is the town's firm policy to make sewer installations for all such new areas. The great majority of the town's Negro residents is afforded sewerage facilities although many such residences actually continue without indoor plumbing, not yet required by local law. The town's policy is to make additions to the sewerage system for extension of the service to all desiring to take advantage of it.

*Surface water drainage.* Having flat, nonporous soil with slow run-off conditions, Shaw suffers from drainage problems common to the Delta area. In the town proper, rain water is ultimately channeled into a bayou known as Porters Bayou, [6] which intersects the middle of the town and some miles away empties into Sunflower River. The bayou's capacity is easily over-taxed due to inherent limitations, and frequent overflows occur in the town and impede drainage of storm waters. No basic relief to this situation will come about without major channel improvement and dredging to the mouth of the Sunflower River, which is well outside the town's corporate limits. Underground storm sewers exist largely in the town's areas south of Porters Bayou and drainage ditches have also been constructed, but these afford inadequate relief because of the inferior outlet sources for rain and storm water.

*Water mains and fire hydrants.* Water is supplied from several deep wells to all town inhabitants. A flat consumer's charge is made; there are no water meters, nor any effective control for possible water waste. No inhabitant is without water brought to his residence. Water mains have been laid throughout the town, consisting of 4″ and 6″ water pipes. As the municipal water wells are located in the south-central portion, water mains must radiate from this point and diameter of mains increased from the well to outlet. 4″ mains located north of Porters Bayou have been "looped" to afford increased pressure. Despite the addition of a new well in 1967, at times water pressure is inadequate in certain localities, irrespective of their racial character. A new tank and larger water well are deemed necessary to achieve satisfactory pressure, and the town has filed application for that purpose with appropriate federal authority seeking a $116,000 grant, upon 50% local contribution.[7] Development of new residential subdivisions has contributed greatly to the need for increased water pressure. Fire hydrants are unremarkably located throughout the town and are within reach of all of the town's improved portions. Fire protection is afforded by a volunteer fire department equipped with one pumper truck. Fire insurance rates are the same for all residential areas; and known fire losses are not attributable to lack of fire hydrants.

None of the plaintiffs, or other Negro citizens of the community, ever requested the town's governing authority to provide additional municipal services in their neighborhoods. However, plaintiffs' counsel contend that the court should require defendants to complete by a specific date, namely, September 30, 1971, the construction of specific facilities "to equalize the black neighborhoods with their white counterparts" at an estimated cost of $250,000, as below

6. Silver Bayou, also intersecting the northeast quadrant of the town and lying northerly of Porters Bayou, empties into Porters Bayou at a point east of the town's corporate limits and is subject to overflow and flooding of adjoining neighborhoods.

7. The evidence indicated this application had received tentative approval by the United States Department of Housing and Urban Development.

detailed,[8] by directing the use of $145,000 presently in the town treasury and by devoting two year's general revenues, and proceeds from a bond issue, if necessary, to complete the work.[9]

We begin with the familiar rule that the "exercise of the powers of the municipality with respect to the making of public improvements, the establishment of public utilities, and the furnishing of public services, rests in the discretion of the governing municipal authorities, insofar as the matter is not controlled by positive law, and the courts will not undertake to control or interfere with the exercise of such discretion in the absence of bad faith or abuse." 38 Am. Jur. Municipal Corporations, § 560, p. 248. Nor is it a valid objection that a public improvement by a municipal corporation "incidentally benefits some individuals more than others, or that from the place of residence, or for other reasons, every inhabitant of the municipality cannot use it, if every inhabitant who is so situated that he can use it has the same right to use it as the other inhabitants." Ibid. Thus, it would seem that determination of the necessity and character of public improvements, the matter of their construction and the priority of accomplishment, ordinarily, are questions to be resolved by officials, usually elected, who constitute the governing authority of the municipality. "Normally, the widest discretion is allowed the leg-

islative judgment in determining whether to attack some rather than all of the manifestations of the evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious." McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222, 228 (1964).

Furthermore, a presumption exists that public officials will discharge their official duties in accordance with law, exercising an honest judgment, and this presumption will be given effect in the absence of clear evidence to the contrary. United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926); Barnes v. City of Gadsden, 174 F.Supp. 64 (D.C.1958), aff'd 268 F.2d 593 (5 Cir. 1959); Thompson v. Housing Authority of City of Miami, Florida, 251 F.Supp. 121 (D.C.1966).

Plaintiffs would avoid the application of these well settled legal principles by claiming that they have been denied the equal protection of the laws as guaranteed by the Fourteenth Amendment, that they have made out a prima facie case of racial and economic discrimination by showing long-continued statistical disparities between white and black neighborhoods in the services provided by the town,[10] and that defend-

---

8. Plaintiffs' counsel suggest the following definite improvements:

   (1) Street paving costs of $146,000 for asphalting 8000 feet of 50-foot wide streets and 11,000 feet of 30-foot wide streets.

   (2) Sanitary sewer costs of $10,000 for laying 4,000 additional feet of line in Reeder Addition and along Elm and Canal Streets.

   (3) Street light costs of $3,100 for replacing every existing street light in the black neighborhoods with mercury vapor fixtures.

   (4) Water main costs of $50,000 (in excess of the 50% local contribution, $55,000, for the HUD project) to install new water mains and new fire hydrants in certain negro neighborhoods.

9. Defendants' counsel advise that since the trial of the case the town has established a bi-racial planning commission in accordance with § 2890.5 Miss.Code 1942. A commission organized under that statute would have authority to prepare and propose (1) a master plan of physical development of the municipality; (2) proposed zoning ordinances and map; (3) regulations governing subdivision of land; (4) building or setback lines on roads; and (5) recommendations to the town's governing authorities with respect to the aforesaid items.

10. Plaintiffs analogize their case to situations involving voting, school desegregation and jury discrimination, in which federal courts have held that disparity based on statistical information alone may

ants have failed to explain such disparities upon rational grounds unrelated to race or poverty. While plaintiffs cite no case making that formula generally applicable to all municipal services, yet it is not to be doubted that "[t]he Equal Protection Clause reaches the exercise of state power *however manifested*, whether exercised directly or through subdivisions of the State." (Emphasis added.) Avery v. Midland County, 390 U.S. 474, 479, 88 S.Ct. 1114, 1117, 20 L.Ed.2d 45, 51.[11]

■■■ It is equally true that, since the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from a state's official sources, "racial classifications are constitutionally suspect", subject to the "most rigid scrutiny", and they are "in most circumstances irrelevant to any constitutionally acceptable legislative purpose." McLaughlin v. Florida, supra, 379 U.S. at 192, 85 S.Ct. at 288. Where racial classifications are involved, the Equal Protection and Due Process Clauses of the Fourteenth Amendment "command a more stringent standard" in reviewing discretionary acts of state or local officers. Jackson v. Godwin, 400 F.2d 529, 537 (5 Cir. 1968).

■■■ Plaintiffs have compiled certain statistics which they claim support a charge that defendants and their predecessors in office have racially classified the black and white neighborhoods by providing better or more complete facilities to the latter neighborhoods, but they would ignore all legitimate deductions to be made from the evidence running counter to statistical racial dispar-

ity. But we do not understand that a court may adopt that manner of reasoning. | If actions of public officials are shown to have rested upon rational considerations, irrespective of race or poverty, they are not within the condemnation of the Fourteenth Amendment, and may not be properly condemned upon judicial review. | Persons or groups who are treated differently must be shown to be similarly situated and their unequal treatment demonstrated to be without any rational basis or based upon an invidious factor such as race. Davis v. Georgia State Board of Education, 408 F.2d 1014 (5 Cir. 1969).

In this case, the fundamental fact emerging from the evidence is that, historically, the town's municipal officers, whether due to an almost static population, limited finances, or adverse economic factors, have long followed a policy of slowly providing basic municipal services to the town's inhabitants. Until the recent past, the municipal policy might be characterized by some as conservative and unprogressive, with no more than $50,000 public improvement bonds having ever been issued. The town, operating on a pay-as-you-go management, has simply not made improvements of the size and character that might be expected under more liberal minded government. That was, apparently, the kind of local government preferred by Shaw's citizens. In any case, cautious fiscal policy dominated the town until recent times, beginning not earlier than 1955. Consequently, some needed facilities were not enjoyed by anyone; they simply did not exist. For example,

establish a prima facie case of racial discrimination. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (racial statistics of persons denied right to municipal vote) ; United States ex rel. Seals v. Wiman, 304 F.2d 53 (5 Cir. 1962) (racial statistics of jurors) ; Whitus v. Georgia, 385 U.S. 545, 87 S. Ct. 643, 17 L.Ed.2d 599 (1967) (racial statistics of jurors) ; Green v. School Board of New Kent County, Va.. 391 U. S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (racial statistics of public school

students) ; United States v. Board of Education of Bessemer, 396 F.2d 44 (5 Cir. 1968) (racial statistics of school teachers).

11. Mr. Justice White, in Avery v. Midland County, supra, p. 480, 88 S.Ct. p. 1118, wrote:

"A city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law."

not until a recent date were any of the residential streets in white or black neighborhoods asphalted except those forming a state highway, or fronting upon commercial or industrial enterprises, or serving school or other public buildings. Resurfacing of these streets at periodic intervals is a maintenance necessity; the use of these streets is of basic importance to the great majority of the town's inhabitants; and their reworking and resurfacing cannot be rationally delayed until all residential streets are paved with asphalt. The streets selected for asphalt paving, in the programs initiated in the past 15 years, have been usually based upon general usage, traffic needs, adequate rights of way and other objective criteria. Also, lack of zoning regulations and haphazard subdivision dedications have hampered the town in its ability to pave all streets; the necessity for acquiring rights of way and easements in order first to properly lay sewers and then adequate street surfacing has accounted for some delay in project fulfillment. Modern sanitary sewers, by any standard certainly considered a necessity, were not installed in any part of the town until 1963. While the complaint about less than 100% sanitary sewerage for all residences is certainly a real one, that condition arises basically from the fact that local law does not yet require indoor plumbing. The lack of sanitary sewers in certain areas of the town is not the result of racial discrimination in withholding a vital service; rather it is a consequence of not requiring, through a proper housing code, certain minimal conditions for inhabited housing. Assuredly, a federal court is not called upon to order the adoption of a housing code by a municipality for the forcing of usage by all of a central sewerage system, and yet the lack of precisely that is a fundamental problem confronting plaintiffs.

By like token, poor drainage is a problem affecting all, both white and Negro alike, that is related to need for major dredging and channel work in Porters Bayou, and may be solved only by major corrective program. Defendants' assertions that they have not discriminated because of race or poverty are supported by substantial, rational considerations explaining the quality and quantity of presently available town's services. These facts negative plaintiffs' assertions of racial and economic discrimination. Marshall v. Mayor and Board of Selectmen of McComb, Mississippi, 251 Miss. 750, 171 So.2d 347 (1965).

Finally, the nature of the relief sought by plaintiffs in their class action directly involves the exercise of administrative judgment in diverse areas of local government. This is a field in which courts should be reluctant to enter because of their incompetence, generally, to bring about a better result than officials chosen by the local inhabitants. This observation is particularly appropriate as to the Town of Shaw, where Negro citizens have voting power approximately equal to that of white citizens. Such problems as plaintiffs have disclosed by the evidence, and which, in our opinion, do not constitute an abridgement of their constitutional rights, are to be resolved at the ballot box. It is that remedy and not injunctive relief which plaintiffs must seek.

An order dismissing the complaint will be entered.