783 F.2d 982
 54 USLW 2518
 William J. AMMONS, Jr., Barbara H. Dobson, Charles A.
Harrison, Vann M. Hughes, and Freddie A. Mitchell,
Jr., on behalf of themselves and all
others similarly situated,
Plaintiffs-Appellees,
v.
DADE CITY, FLORIDA, William L. Dennis, Mayor of Dade City,
Florida, Agnes L. Lamb, Colonel Charles McIntosh, Jr.,
Williams F. Brewton, and D.L. Williams, City Commissioners
of Dade City, Florida, their successors and agents in their
official capacities, Defendants-Appellants.
 No. 84-3786.
 United States Court of Appeals,
Eleventh Circuit.
 March 3, 1986.
 
 Charlie Luckie, Jr., Dade City, Fla., for defendants-appellants.
 David M. Lipman, Robert E. Weisberg, Miami, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and JOHNSON, Circuit Judges, and HOFFMAN*, Senior District Judge.
 PER CURIAM:
 
 
 1
 Appellants Dade City, Florida and its public officials, William F. Brewton, Agnes Lamb, Charles McIntosh, Jr., William L. Dennis and D.L. Williams, appeal the judgment of the district court that they intentionally discriminated in violation of the fourteenth amendment in the provision of street paving, street resurfacing and maintenance, and storm water drainage facilities to the black community of Dade City. We find that the district court's finding that appellants' conduct constituted intentional racial discrimination in the provision of these municipal services is amply supported by the record evidence and not clearly erroneous. Accordingly, we affirm.
 
 BACKGROUND
 
 2
 On February 23, 1981 appellees, a class of black citizens of Dade City, Florida[1] filed this action patterned after the municipal services equalization cases of Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir.1971), aff'd on rehearing, 461 F.2d 1171 (5th Cir.1972) (en banc); and Johnson v. City of Arcadia, 450 F.Supp. 1363 (M.D.Fla.1978). Appellees alleged in their complaint that Dade City, its Mayor and four city commissioners deprived black citizens of equal municipal services in violation of the thirteenth and fourteenth amendments,[2] and sought that the qualitative and quantitative disparities between the municipal services provided to the black and white residential communities be eliminated.
 
 
 3
 A three day non-jury trial was held during July 13-15, 1983. At the conclusion of trial the court reserved ruling and allowed both parties to submit proposed findings and post-trial memoranda. On September 21, 1984 the district court entered final judgment for appellees on the basis of its findings of fact and conclusions of law which determined that street paving, street resurfacing and maintenance, and storm water drainage facilities were provided inadequately and unconstitutionally to the black community of Dade City.[3] Ammons v. Dade City, 594 F.Supp. 1274 (M.D.Fla.1984). The district court consequently enjoined appellants from providing the three contested municipal services in a racially discriminatory manner and from initiating any new municipal services or improvements, other than customary and regular maintenance work, in the white residential community until the services in issue in the black residential community were on a par with those in the white community. Id. at 1305-06. Appellants were also directed to submit a plan to the district court for the elimination of the disparities in services which were found to have existed. Id. at 1306.
 
 ISSUES
 
 4
 The basic issue on appeal is whether the district court erred in finding that Dade City and its public officials intentionally discriminated against the City's black residents in the provision of street paving, street resurfacing and maintenance, and storm water drainage facilities. Appellants in particular cite the following as error: (1) the district court's inclusion in the overall municipal services disparity analysis of certain streets in the black residential community that were annexed into Dade City in 1982, subsequent to the filing of the lawsuit; (2) the district court's inclusion in the overall municipal services disparity analysis of certain streets that although located in the white residential community of Dade City, were owned and maintained by state and county authorities; and (3) the district court's conclusion that Dade City did not have a non-discriminatory uniform special assessment policy for street paving purposes.
 
 DISCUSSION
 
 5
 As we stated in the municipal services equalization case of Dowdell v. City of Apopka, 698 F.2d 1181, 1184-85 (11th Cir.1983) (citing Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)), in order "[t]o trigger strict scrutiny analysis under the fourteenth amendment, preliminary findings of both disparate impact and discriminatory intent are required." Accordingly, in reviewing the district court's decision in this case we focus on its findings of disparate impact and discriminatory intent. We address these findings seriatim.
 
 
 6
 We are mindful at the outset that while conclusions of law are freely reviewable, we are bound under Fed.R.Civ.P. 52(a) by the district court's factual findings, including its finding of intentional discrimination, unless clearly erroneous.[4] See Pullman-Standard v. Swint, 456 U.S. 273, 287-90, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982). For a finding to be clearly erroneous the reviewing court, looking at all the evidence, must be "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). As the Supreme Court instructed this past term in Anderson v. City of Bessemer City, U.S. ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (citations omitted):
 
 
 7
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 8
 This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
 
 A. Disparate Impact
 
 9
 The district court's methodology in reaching its findings of disparate impact was to first analyze appellees' evidence on the racial and demographic characteristics of Dade City.[5] On the basis of this evidence the court found that the City's black residential community is comprised of two adjoining areas that are geographically segregated " 'on the other side of the railroad tracks.' "[6] Ammons, 594 F.Supp. at 1278 (footnote omitted). Having thus determined the existence of racially identifiable neighborhoods in Dade City, the court then analyzed a wealth of statistical, documentary and testimonial evidence[7] introduced by appellees relating to the distribution and financing of the three contested City provided services. This evidence amply supports the district court's findings of a significant disparity between the races in the provision of street paving, street resurfacing and maintenance, and storm water drainage facilities.[8]
 
 
 10
 In so holding, we reject appellants' arguments challenging the validity of the statistical data base from which the district court derived its findings. As stated earlier, appellants cite as error the district court's inclusion in the overall disparity analysis of: (1) streets in the black residential community that were annexed into the City in 1982 during the course of the litigation; and (2) streets in the white residential community that were owned and maintained by state and county authorities. Appellants contend, as they did at trial, that this statistical evidence has no materiality to the instant lawsuit, alleging intentional discrimination in the provision of municipal services, because the City is responsible only for providing services to areas within its municipal limits that are owned by the City.
 
 
 11
 We do not, however, understand the district court to have ruled that a city has an obligation to annex black residential areas or to service areas outside of its municipal limits, or that it has the power or duty to service areas owned by other governmental authorities. Rather, what the district court determined, as a factual matter, was that it was equitable in this case that these two categories of streets be included in the statistical data base for the purpose of calculating disparate impact. This determination was premised on a number of subsidiary factual findings which we find persuasive and, at the very minimum, not clearly erroneous.
 
 
 12
 First, as regards the inclusion of residential streets in the 1982 annexed area, the court determined that, "the relationship between the area annexed in 1982 and the City is sufficient to constitute part of the black community for the purposes of a present disparity analysis," id. at 1287, based on the following factual findings: (1) the 1982 area is part of the general black community wedged west of the railroad tracks and "for years previously, [had] functioned as an integral part of the City," id. at 1286, and as part of the black community; (2) that geographically, according to the uncontraverted testimony of appellees' planning expert, it "is essentially engulfed by and contiguous with the City limits," id. at 1287; and (3) that the equities compel inclusion, given the City's past active participation and encouragement of annexing white residential areas into the City, particularly through its sharing of the expenses in paving of those new white residential areas, id., as contrasted to the lack of "evidence that the [C]ity took any steps to initiate the annexation process for [the 1982 annexed area]." Id.
 
 
 13
 Second, as regards the inclusion of City residential streets owned by the state and county, the district court properly determined that "[t]o not calculate the state/county owned residential streets in the disparity analysis would reward the City for its racially segregated practices,"[9] id. at 1288, based on findings that:[t]he City's racially discriminatory practices ... forced blacks to live on the 'other side of the tracks,' an area geographically set apart from the white residential neighborhoods which enjoy the benefits of the state/county owned paved streets. This occurred through a series of City actions--beginning with the 1914 ordinance prohibiting the intermingling of the races and continuing through the City's actions in the post-World War II era in developing the racially segregated Mickens-Harper Subdivision. Id.[10]
 
 
 14
 Another finding dictating the court's determination to include these residential streets in the disparity analysis was the City's "intimate[ ]" involvement through its repeated requests, over three decades, to have these streets maintained and paved. Id.
 
 
 15
 Appellants also take issue with the district court's conclusion that appellants did not have a non-discriminatory uniform special assessment program for street paving purposes. In Hadnott v. City of Prattville, 309 F.Supp. 967 (M.D.Ala.1970), the court held that the City of Prattville had paved streets and provided other services upon the basis of a uniform and non-racially discriminatory assessment policy and although, due to economic factors, this resulted in a disparity in the providing of paving in the black residential areas as compared to white residential areas, it was not constitutionally discriminatory.
 
 
 16
 The district court in this case found, however, that Dade City's assessment practice did not present a defense to the findings of disparity between the City's black and white residential neighborhoods "since the facts presented in [Hadnott ] so significantly and materially differ from this action that the Hadnott principle has no application." Ammons, 594 F.Supp. at 1289. We agree. The district court's conclusion rests on the following factual findings, all amply supported by the record evidence: (1) the City's assessment policy was "non-uniform in nature in that many paved streets were never assessed at all," id. at 1299; (2) as to a significant portion of streets that were assessed, assessment liens were frequently never collected, id.; and (3) the assessment policy had been applied in a racially discriminatory manner "in that black citizens were required, when attempting to develop the major black Mickens-Harper Subdivision, to pay their assessment in advance of the paving which is contrary to City policy and never required in any white residential neighborhood." Id. We cannot say that these factual findings regarding the City's assessment policy are clearly erroneous nor do we find the district court's conclusion that the City's assessment practice presents no bar or defense to appellees' constitutional claims in error.
 
 B. Discriminatory Intent
 
 17
 After finding a disparity in the provision of street paving, street resurfacing and maintenance, and storm water drainage facilities, the district court proceeded with its "constitutional inquiry", id. at 1300, as to whether the inequality in the three services resulted from a discriminatory intent or purpose. There must be a "correlation between municipal service disparities and racially tainted purposiveness to mandate a finding of discriminatory intent." See Dowdell v. City of Apopka, 698 F.2d 1181, 1185-86 (11th Cir.1983). The district court's analysis and findings of intentional discrimination in this case parallel those previously found by this court in Dowdell as constituting "[n]early every factor which has been held to be highly probative of discriminatory intent." Id. at 1186. Those factors found by the district court and discussed in detail, Ammons, 594 F.Supp. at 1300-03, include discriminatory impact; foreseeability; legislative and administrative history; and knowledge. We now consider the district court's findings as to each of these four factors.
 
 
 18
 First, with respect to the factor of discriminatory impact the district court properly found that although "official act[ion] is not necessarily unconstitutional solely because it has a racially disproportionate impact," Ammons, 594 F.Supp. at 1301 (citing Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450 (1977)), due to the "(1) size of the disparity, and (2) nature of the practices at issue in this case," Ammons, 594 F.Supp. at 1301, impact alone does give rise to "an inference of discriminatory intent." Id. Appellants, as previously discussed supra, offered extensive evidence concerning the magnitude of the disparities in municipal services between the races which amply supports the district court's finding. The magnitude of the disparities in services in this case is, as we similarly found in Dowdell, 698 F.2d at 1186 (citations omitted), "explicable only on racial grounds."
 
 
 19
 Second, when it is foreseeable, as the evidence reflects in this case, that the allocation of greater resources[11] to the white residential community at the expense of the black community will lead to the "foreseeable outcome of a deprived black residential community," Ammons, 594 F.Supp. at 1302 (citing Dowdell, 698 F.2d at 1186), then a discriminatory purpose as found by the district court is properly shown. Third, in tracing the history and development of Dade City, particularly with respect to race relations, for its connection to present discrimination in the provision of the contested municipal services, the district court correctly relied upon a large body of constitutional jurisprudence which recognizes that the historical context of a challenged activity may constitute relevant evidence of intentional discrimination. See Ammons, 594 F.Supp. at 1302-03. The district court's findings in this case of a "legislative and administrati[ve] history of racial discrimination in general and in the allocation and distribution of the contested municipal services in particular," id. at 1303, are supported by a multitude of documentary and testimonial evidence covering practically every aspect of municipal conduct in Dade City throughout its history. See id. at 1279-84. Finally, the district court's findings as regards the factor of knowledge are amply supported by the evidence:
 
 
 20
 That their actions [City's] would result in a discriminatory impact on the residents of the black community was not unknown to defendants. A brief visit to the black community makes obvious the need for street paving and storm water drainage control.
 
 
 21
 Id. at 1303, (brackets in Ammons ) (quoting Dowdell v. City of Apopka, 511 F.Supp. 1375, 1383 (M.D.Fla.1981), aff'd in part, rev'd in part, remanded in part, 698 F.2d 1181 (11th Cir.1983).
 
 
 22
 Although none of these four factors are "necessarily independently conclusive, 'the totality of the relevant facts,' " Dowdell, 698 F.2d at 1186 (quoting Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049), amply supports the district court's findings that appellants' course of conduct manifests discriminatory intent "which is the cause and reason for the present disparity in (1) street paving, (2) street resurfacing [and maintenance], and (3) storm water drainage services." Ammons, 594 F.Supp. at 1303 (footnote omitted). In sum, the finding of intentional discrimination by the district court is not clearly erroneous.
 
 CONCLUSION
 
 23
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 By order of May 28, 1982, the district court certified the class pursuant to Fed.R.Civ.P. 23(b)(2) to include: "All black residents of Dade City, Florida, who have been affected by the Defendants' alleged policy or practice of racial discrimination in the providing or financing of municipal services." Ammons v. Dade City, 594 F.Supp. 1274, 1277 (M.D.Fla.1984)
 
 
 [2]
 Appellees' constitutionally based claims were brought pursuant to 42 U.S.C. Sec. 1983 (1982). In addition, at the time the complaint was filed, appellees also sought relief under Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq. (1982) and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. Sec. 1242 (1976) (current version at 31 U.S.C. Sec. 6716 (1982)), and asserted claims with respect to the provision of the following municipal services: street paving; street resurfacing and maintenance; sewerage facilities; water; storm water drainage facilities; fire protection and street lighting. At the commencement of the trial, however, appellees proceeded insofar as liability only under their constitutionally based claims and only as they related to the provision of street paving, street resurfacing and maintenance and storm water drainage facilities. See Ammons, 594 F.Supp. at 1277 n. 1
 
 
 [3]
 In addition, the district court determined as a matter of law that the filing of appellees' lawsuit was " 'the significant factor or substantial catalyst' " for a number of municipal service improvements that appellants had implemented in the black community after the filing of the lawsuit in 1981. Id. at 1304
 
 
 [4]
 We are advised that the district court in this case adopted, virtually verbatim, the proposed findings of fact and conclusions of law submitted by appellees at the conclusion of trial. Contrary to appellants' suggestion, however, the district court's reliance on appellees' post-trial findings and legal conclusions does not require us to give less deference to the district court's findings than that mandated by Rule 52(a). We reiterate here what we have previously said--although we do not approve "of the practice of unconditionally adopting findings submitted by one of the parties to the litigation," Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960, 962 (5th Cir.1975), the clearly erroneous standard of Rule 52(a) nonetheless applies to such findings. Id. at 963 (footnote omitted). Our primary concern remains the substantiality of the record evidence to support the district court's findings, regardless of whether such findings were initially prepared by the court or the prevailing party. See Hamm v. Members of Bd. the of Regents, 708 F.2d 647-48, 650 (11th Cir.1983) (citations omitted). This record eliminates any doubt about the district judge's involvement in the matter and the careful analysis of both the law and evidence
 
 
 [5]
 The district court explained in detail how this demographic data was compiled through a statistical compilation admitted into evidence under Fed.R.Evid. 1006. See Ammons, 594 F.Supp. at 1278 n. 5. We note that appellants contested the appellees' demographic data as it related to the description of the geographical boundaries of the City's black community. Appellants proposed instead a boundary description that would "include all the areas described by [appellees] plus additional parts of the City encompassing census block districts with a minimum of ten percent black residents." Id. at 1279 n. 6. As the district court found, however, appellants offered no census, planning, engineering or legal standard to support their proposed boundary description. Appellees' description, on the other hand, was found to be "accurate," id., and we cannot conclude that the district court's findings on this matter are clearly erroneous
 
 
 [6]
 As the district court recognized, id. at 1278 n. 4 (quoting our predecessor court's seminal decision in Hawkins v. Town of Shaw, 437 F.2d 1286, 1291 (5th Cir.1971), aff'd on rehearing, 461 F.2d 1171 (5th Cir.1972) (en banc)):
 Referring to a portion of town or a segment of society as being 'on the other side of the tracks' has for too long been a familiar expression to most Americans. Such a phrase immediately conjures up an area characterized by poor housing, overcrowded conditions and, in short, overall deterioration.
 
 
 [7]
 For an account of the evidence from which the district court derived its findings of disparate impact in, respectively, street paving, street resurfacing and maintenance, and storm water drainage facilities, see Ammons, 594 F.Supp. at 1285, 1290, 1292-93 (footnotes omitted)
 
 
 [8]
 The district court found the following statistically significant disparities:
 
 
 [1]
 street paving --at the commencement of trial on July 13, 1983, 29.5% of the street footage in the black community was unpaved as compared to 18.1% in the white community and 31.1% of the residences in the black community fronted on unpaved streets as compared to 13.8% of the residences in the white community. Id. at 1285
 
 
 [2]
 street resurfacing and maintenance --between 1956 to 1980 out of the total street footage resurfaced, 9.7% of the resurfacing was done in the black residential community as compared to 90.3% done in the white residential community. Street resurfacing and maintenance "is financed entirely from City funds," and out of the total monies, $117,154.24, spent for street resurfacing during that same 1956 to 1980 period, 10% was spent for resurfacing in the black residential community as compared to 90% spent for resurfacing in the white residential community. Id. at 1290
 Moreover, the court found that the disparity in street resurfacing and maintenance was not "rebutted by the City with any explanation, policy or practice which could support a conclusion that it exists for any other reason other than race considerations." Id. at 1292.
 
 
 [3]
 storm water drainage facilities --storm water drainage in Dade City is provided through both an above-ground facility network as well as an underground system of piping. Id. at 1293. At the commencement of trial on July 13, 1983, 50.1% of the street footage in the black residential community had no above-ground drainage device as compared to 28.3% in the white residential community, id. at 1294, and 50% of the residences in the black residential community fronted on streets with no above-ground drainage device as compared to 25.5% of the residences in the white residential community. Id. at 1295. Analysis of the underground drainage system revealed a "fairly extensive system throughout the City's white residential community," id. at 1293, while, other than a "small two block area" on one street, there was no underground system in the entire black residential community. Id
 While appellants continue to assert on appeal, as they did at trial, that the black residential community does not need any more drainage facilities, the court properly found this assertion as being "totally without merit." Id. at 1295. The record supports the court's finding that appellants' assertion is "in direct conflict [with] the testimony of [appellees'] expert, ... other black community witnesses, and in fact in conflict with observations of [appellants'] own city manager and finance director. Id. (footnote omitted).
 
 
 [9]
 As the court observed, appellants' challenge to the inclusion of state and county owned streets has no impact in the City's black community as residential streets in that area are all, with one minor exception, City owned. Id. at 1287 & n. 16. In contrast, there are thirty state and/or county owned paved streets in the City's white residential community. Id. at 1287 n. 16
 
 
 [10]
 We note that appellants continue to argue on appeal, as they have throughout the course of the litigation, that they are not responsible for the pattern of residential segregation in Dade City, i.e., for the creation of the "other side of the tracks" where most of Dade City's blacks continue to reside. We find, however, that the district court's findings that the city was directly responsible for the creation, development and continuation of a segregated black residential community are wholly supported in the record by an impressive array of documentary and testimonial evidence. See id. at 1280-81
 
 
 [11]
 The district court found this factor "most graphically documented with street resurfacing expenditures; ... but equally applicable to the other services." Id. at 1302. See supra at 985 n. 8