Hinton JOHNSON, on behalf of himself and all others similarly situated, Plaintiff,

v.

CITY OF ARCADIA, FLORIDA, E. Coleman Brewer, Mayor of the City of Arcadia, Florida, Eugene Hickson, Sr., Lester Summerall, Walter J. Banull, I. D. Eller, Jr., Councilmen for the City of Arcadia, Florida, their successors and agents, Defendants.

No. 76–12 Civ. Ft. M–K.

United States District Court, M. D. Florida, Fort Myers Division.

March 23, 1978.

David M. Lipman, Paul R. Dimond, Lawyers Committee for Civil Rights Under Law, Washington, D. C., Joseph J. Levin, Jr., Pamela S. Horowitz, Montgomery, Ala., Michael Masinter, Florida Rural Legal Services, Homestead, Fla., for plaintiff.

John H. Treadwell, III, Arcadia, Fla., for defendants.

## MEMORANDUM OF DECISION

KRENTZMAN, District Judge.

The Court, having considered the pleadings, the testimony, exhibits and other evidence adduced in the course of the trial, at the end of which the Court made findings in the record, and having considered the post-trial and proposed findings of fact submitted by each of the parties, and being advised in the premises, makes and finds the following findings of fact and conclusions of law,[1] pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. PROCEDURAL BACKGROUND

1. On February 25, 1976, plaintiffs—consisting of a class of all black citizens of Arcadia, Fla. allegedly deprived of equal municipal services—filed a complaint based upon *Hawkins v. Town of Shaw*, 303 F.Supp. 1162 (N.D.Miss.1969) *rev'd* 437 F.2d 1286 (5 Cir., 1971) *aff'd en banc,* 461 F.2d 1171 (5th Cir. 1972) seeking that disparities in the quality and quantity of certain services provided to black and white citizens be ameliorated.

2. Plaintiffs in addition invoked the jurisdiction of this Court pursuant to 42 U.S.C. § 2000d et seq. (Title VI of the Civil Rights Act of 1964) and 31 U.S.C. § 1242 (State and Local Fiscal Assistance Act of 1972, hereinafter "Revenue Sharing Act") and sought to apply the Revenue Sharing Act's anti-discrimination provisions. *See,* 31 C.F.R. 5152, *as amended,* 40 Fed.Reg. 50029 (1952). *See also, Robinson v. Schultz,* 8 E.P.D. ¶ 9832 D.D.C.1974, *Robinson v. Simon* and *United States v. Chicago,* 395 F.Supp. 329 (N.D.Ill.1975).

3. At the same time of the filing of the complaint, plaintiffs filed two sets of interrogatories, a request for production of documents and an extensive set of requests for admissions of fact concerning the City's delivery of municipal services and its budgeting mechanisms and practices.

4. On March 26, 1976, defendants filed various "across-the-board" pre-trial motions with supportive memoranda.[2] Plaintiffs filed extensive responsive memoranda and this Court heard oral argument on all pre-trial legal issues on September 27, 1976, in Tampa, Florida.

5. On October 21, 1976, the Court denied all of defendants' motions and directed plaintiffs' counsel to file a concurrent administrative complaint with the Secretary of Treasury relating to plaintiffs' Revenue Sharing claims. In addition, it granted plaintiffs' motion to certify this proceeding as a class action. Plaintiffs' class consists

---

[1] Final Judgment, as to relief, has been consented to by parties and approved by this Court. Nonetheless, this Court deems it desirable to make written findings of fact and conclusions of law, since plaintiffs proceed in this litigation as a certified class. *See e. g., Girsh v. Jepsen,* 521 F.2d 153 (3rd Cir. 1975); *Byran v. Pitts Plate Glass Co.,* 494 F.2d 799 (3rd Cir.), *cert. den.* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

[2] Defendants' motions included: 1) motion to dismiss, alleging: (a) plaintiffs had failed to state a claim against defendants upon which relief can be granted, (b) the Court lacked jurisdiction over defendants because the amount in controversy did not exceed $10,000 for each member of the class, (c) the complaint as framed was vague and indefinite and therefore defendants could not properly answer, (d) plaintiffs failed to exhaust administrative remedies pursuant to 31 U.S.C. § 1242 and 42 U.S.C. § 2000d; 2) motion to strike, challenging: (a) plaintiffs' claim for fees, (b) plaintiffs' right to immediate relief, (c) plaintiffs' claims under the Revenue Sharing Act; 3) motion for protective order—relating to plaintiffs' initiation of discovery, and 4) defendants' motion to tax costs.

of all black residents residing in the City of Arcadia.

6. Thereafter, the plaintiffs conducted lengthy and complex pre-trial discovery concerning sophisticated financial and municipal service documents, reports and files. Counsel for plaintiffs with the assistance of their technical experts reviewed a complete inventory of service and financial data relating to the defendant City of Arcadia.

7. On April 11, 1977, trial commenced. The Court heard testimony over a two-day period relating to plaintiffs' claims of racial discrimination in the provision of certain municipal services in the City of Arcadia, Florida. On April 12, 1977, this Court in its bench opinion found that defendants had historically and presently perpetrated racial discrimination against plaintiffs with regard to the following municipal services:

 (a) the distribution of water facilities;

 (b) street paving; and

 (c) park and recreational facilities.

8. After holding that defendants had discriminated against plaintiffs, this Court enjoined defendants from spending any of the approximately $415,000 of revenue sharing funds which it had on hand or any future revenue sharing funds without further order of Court. Pursuant to the Court's direction it has received from the parties comprehensive plans to equalize street paving, water systems, and park and recreational facilities in the black residential area of Arcadia.

9. The Court has received from the parties a stipulated final judgment which this Court has examined and approved as to relief. The final judgment sets forth in detailed fashion the type and quality of improvement works needed to eliminate racial discrimination in the provision of certain municipal services in the City of Arcadia.

## B. THE PARTIES

10. Hinton Johnson, et al., plaintiffs, are adequate representatives of a class consisting of all of the black residents of the city who are presently and have been discriminated against by the defendants in the provision of municipal services and facilities as hereinafter set forth. (*See,* Court order certifying class, October 21, 1976).

11. Defendant E. Coleman Brewer is the mayor of the City, defendants Eugene Hickson, Lester Summerall, I. D. Eller and Walter J. Banull are the councilmen, and Margaret Way is the City Recorder. Defendants have complete responsibility for administering the affairs of the town, including the provision, allocation and financing of all municipal facilities and services. [Source: Defendants' response to plaintiffs' first interrogatories Nos. 2 and 5.]

12. The City of Arcadia is a municipal corporation with a charter adopted pursuant to Chapter 5080, Special Acts of 1901 of the Florida Stat. Annotated. It was originally incorporated on December 8, 1886, and reincorporated in 1901. In area the City is approximately two miles square. Its present population of approximately 7,000 is 32% black and 68% white. [Source: Defendants' response to plaintiffs' request for production and inspection of documents (City Charter and Census Reports).]

13. The City of Arcadia has developed according to a strict pattern of residential racial segregation. The entire black community is bordered by railroad tracts to the east, north and west. Parker, Jordan, Baldwin, Manatee and Orange Streets, primarily in the black section, extend just one block north of Pine Street (which parallels the east-west railroad track). No blacks reside anywhere outside this small geographical area in the southwest portion of Arcadia. Some white households are located in the black section, where Monroe and Orange Streets between Hargrave and Harris are integrated. [Source: City Map of Arcadia, defendants' Exhibit No. 4.]

14. The City of Arcadia provides, maintains and improves certain facilities for its residents. It has always been responsible for the construction and maintenance of the

public rights of way. The City has undertaken the paving of streets, construction of park and recreational facilities and construction of an underground water system. Construction and/or improvements to these services has been financed wholly from either general revenues, derived from ad valorem tax or various federal monies from the following federal agencies: Department of Treasury (Revenue Sharing), Department of Housing and Urban Development (Low-Income Housing grants and loans) and the Environmental Protection Agency (Water and Sewer System grants). [Source: Defendants' responses to plaintiffs' first interrogatories No. 9.]

## C. HISTORICAL DISCRIMINATION

15. Excerpts from entries from the official city minute books of the City of Arcadia, dating back as early as 1950 through the present, reveal a continuing unresponsiveness on behalf of white city elected officials to black citizens' needs. Specifically, City officials continually failed to act upon black citizens' requests to improve or extend various city provided services to black homeowners while at the same time these City officials responded affirmatively to similar requests from white citizens. [Source: Plaintiffs' Exhibit No. 25, Excerpts from Official City Minute Books of the City of Arcadia]

16. City officials knew that municipal service conditions in the black residential neighborhood of Arcadia were a severe problem. In 1968, Milo-Smith Associates, a Tampa based planning and consulting firm, contracted with the City of Arcadia to produce a Neighborhood Analysis, containing evaluations of municipal services and recommendations for future planning. In this plan, Neighborhood Two, which is the black community, is singled out as being the most severely blighted area of the City. The plan directed that the City of Arcadia invest a majority of its financial resources for needed neighborhood improvements in this area. City officials failed to implement this plan. [Source: Milo-Smith Neighborhood Analysis, Plaintiffs' Exhibit No. 4]

17. The Milo-Smith plan called City officials' attention to the fact that "The entire street pattern south of Pine Street is chaotic and to a significant degree underdeveloped." (Page 12) City officials did nothing to eliminate this chaotic condition. [Source: Milo-Smith Neighborhood Analysis, Plaintiffs' Exhibit No. 4]

18. The Milo-Smith report emphasizes the black neighborhood's lack of adequate recreation facilities and underground storm sewerage. While the other (white) neighborhoods analyzed in Arcadia were not completely provided for in all services, Milo-Smith left little doubt that these neighborhoods had been the primary recipients of adequate municipal services. The pressing needs of the black community were underscored in the plan's concluding remarks:

*Summary*
"Neighborhood two contains Arcadia's largest neighborhood population and also its worst problems. This may be demonstrated by the fact that 78.6% of Arcadia's substandard structures are located in the neighborhood. The area has the highest incidence of fire, crime and disease. Blighting influences, though certainly a major factor for the onset of deterioration, are not the whole problem. Residents attempting to live and own homes on an income which is below subsistence level find it impossible to maintain an adequate environment. *The net result of these factors is conditions which demand the greatest attention and expenditure from the City of Arcadia for this area than for any other neighborhood.*" (Page 13) (emphasis added) [Source: Milo-Smith Neighborhood Analysis, Plaintiffs' Exhibit No. 4]

19. During an eight month period in 1968, author Marc Lane and photographer Carolyn Mugar investigated general living conditions of Arcadia's black citizens. Their investigation revealed the following:

1) No blacks were employed in public facilities.

2) No blacks were seen in restaurants.

3) No blacks were seen in the town's bus depot.

4) Many blacks lived in chicken coops too small for grown individuals to stand erect inside.

5) Streets in the black community started and stopped abruptly, making smooth, circular travel impossible.

6) The public cemetery was segregated into white and black sides. The white side was green, lush and well maintained. The black side was barren, treeless and overgrown. [Source: Testimony of Plaintiffs' Expert Witnesses: Marc Lane—Author, Investigator, Lawyer; Carolyn Mugar—Photographer, Research Assistant.

20. For at least twenty years, the City of Arcadia has regularly consulted its Planning and Zoning Board on allocation of revenues, selection of projects and general administration of City government. Members on the Planning and Zoning Board are appointed by City officials. The Board's primary responsibility is to establish policy and priorities for the construction and maintenance of municipal service improvements. Every individual who has ever sat on this board up to and including the present is white. [Source: Testimony of E. Coleman Brewer, Mayor of Arcadia]

D. MUNICIPAL STREETS
1. STREET PAVING

21. There is presently 261,160 feet of residential street footage (public rights of way on which one or more persons reside) within the corporate limits of the town. The black population resides on 48,380 feet of these streets while the white population resides on 212,780 feet. Of the 48,380 feet of residential streets in the black community, 5,020, or 10.3%, are unpaved. In the white community, however, only 4.2%, or 9,075 feet of residential street footage, black to white, is 2.4 to 1. This means that black residents of Arcadia are approximately two and one half times as likely as white residents to live on an unpaved street.

A total of 1,920 households exist within the corporate limits of the City. Of the 612 households in the black community, 66, or 10.7%, front on unpaved streets. In the white community, of the 1,308 households only 38, or 2.9%, front on unpaved streets. The ratio of percent of households fronting unpaved streets, black to white, is 3.6 to 1. This means that black residents of Arcadia are approximately three and one half times more likely than white residents to live in a household which fronts on an unpaved street. [Source: Plaintiffs' Exhibit No. 9, Inventory of Street Conditions; Hereafter, Plaintiffs' Exhibit No. 9 and Testimony of City Administrator, Arthur Dyal]

22. At the time of the filing of this lawsuit, March, 1976, the existing disparity in street paving service between the black and white communities was even greater than at present. This is due to the fact that while the number of white unpaved streets has remained constant, a large number of black unpaved streets have been paved since the filing. At that time, the black community contained 10,210 feet, (or 21.1% of its total residential street footage), of unpaved streets. The ratio of percent of unpaved street footage, black to white, was 5.0 to 1. Of the total households in the black community, 107, or 17.4% fronted on unpaved streets. The ratio of households fronting unpaved streets, black to white, was 6.0 to 1. [Source: Plaintiffs' Exhibit No. 9; Testimony of Plaintiffs' expert witness Alan Paller, P.E., Engineer and Urban Systems Analyst; Testimony of City Administrator, Arthur W. Dyal]

23. The City of Arcadia has maintained that certain streets in the black community were unpaved because:

1) they were undedicated;

2) they were either abutting, or, the actual property of the Seaboard Coastline Railroad Co., and;

3) the street was divided in half between the City and DeSoto County.

As to the first two defenses, the City stated that it lacked the necessary right of way to pave the affected streets. As to the third

defense the City stated that it was not responsible for street paving based on its agreement with the county.

24. The City of Arcadia has maintained that the following streets are undedicated:

1. No Name # 1 (Plaintiffs' Exhibit No. 9, Fact 22)

2. No Name # 2 (Plaintiffs' Exhibit No. 9, Fact 26.1c)

3. Myrtle St. (Plaintiffs' Exhibit No. 9, Fact 26.1b)

4. Entrance to Gym (Defendants' Exhibit No. 5)

25. At least since 1970, the streets listed *supra.,* have been maintained in a continuous and uninterrupted manner. Street surfaces have been shelled and graded, garbage has been collected regularly and routine maintenance has been performed upon citizen request. Florida law is instructive:

> "When a road, constructed by a county, or municipality, or the Division of Road Operations, has been maintained or repaired continuously and uninterruptedly for four years by the county, municipality, or Division of Road Operations, jointly or severally, the road shall be (deemed to be) dedicated to the public to the extent in width that has been actually maintained for the prescribed period, whether the road has been formally established as a public highway or not." [3] Fla.Stat.Ann. § 95.361 (1976)

26. Furthermore, municipal services normally afforded residents of City streets of Arcadia, i. e. street lights, fire hydrants, underground water and underground sewer lines are provided on the streets listed herein.

■ 27. As a second defense, the City of Arcadia argued that it was unable to pave the following two streets because of legal ownership issues involving the Atlantic Coastline Railroad:

1) Pine Street (Plaintiffs' Exhibit No. 9, Fact No. 30–a)

2) Tillis Street (Plaintiffs' Exhibit No. 9, Fact No. 33)

28. Pine Street has been regularly shelled and graded, had garbage collected and has otherwise been maintained in a continuous and uninterrupted manner for at least seven years. As such, it is undisputably a dedicated public right of way and presents no legal obstacles to paving contrary to the City's assertions.

■ 29. The City of Arcadia argued that it had no legal access to pave Tillis Street because such access required crossing railroad property. Tillis Street, however, has been maintained in a continuous and uninterrupted manner by the City for at least seven years. In so doing, the City has regularly utilized railroad property for access to the street.

30. Up to the time of trial, the City, through its public officials, had never approached the Railroad Company with a request for their permission to gain access for paving, it has now done so.

■ 31. Hargrave Street forms the City limit in the southwest portion of the City. To the south of its center line is county property, to the north is City property. By agreement between the two governing bodies, the county does the actual maintenance of the street, which has proceeded continuously and uninterruptedly for at least seven years. DeSoto County bills the City proportionally for the maintenance work performed on its portion of Hargrave. By virtue of its continuous maintenance, the

---

**3.** *See also: Lovey v. Escambia County,* 141 So.2d 761 (Fla.App.1962) (The term "constructed by" has been held to include improvements and repairs to an existing road); *Pasco County v. Johnson,* 67 So.2d 639 (Fla.1953); *Bishop v. Nussbaum,* 175 So.2d 231 (Fla.App.1965); *Roe v. Kendrick,* 146 Fla. 119, 200 So. 394 (1941); *Sobolt v. State Road Department,* 176 So.2d 590 (1965); *Indian Rocks Beach South Shore, Inc. v. Ewell,* 59 So.2d 647 (Fla.1952); *United States v. 936.71 Acres of Land, State of Florida,* 418 F.2d 551 (5th Cir. 1969) and *City of Hollywood v. Zinkil,* 283 So.2d 581 (Fla.App.1973) (Florida Supreme Court reaffirmed the proposition that acceptance need not be formal and may be public user).

City's claim that Hargrave Street is an undedicated street is unfounded.

32. The City of Arcadia, through its public officials, has never approached the county with an offer to jointly pave the unpaved portion of Hargrave Street.

■ 33. It is an "unwritten" policy of the City of Arcadia that dead-end streets are the lowest priority for paving. This defense was provided as an explanation for the following streets in the black community being unpaved:

1) Singleton Avenue (Plaintiffs' Exhibit No. 9, Fact No. 32–a, Pg. 4)

2) Dade Avenue (Defendants' Exhibit No. 5)

3) Madison Avenue (Plaintiffs' Exhibit No. 9, Fact No. 26–b)

4) Spring Avenue (Plaintiffs' Exhibit No. 9, Fact No. 32–a, Pg. 5)

5) Citrus Avenue (Plaintiffs' Exhibit No. 9, Fact No. 8–a)

In conjunction with the streets to which the City pleaded "Undedicated—no responsibility" these represent all the remaining black unpaved streets in Arcadia. [Source: (Facts 23–33) Testimony of Dyal]

34. This unwritten policy has an inherently discriminatory impact on black Arcadia. A far higher percentage of streets in the black community are dead-end than in the white community. In the black community, thirteen of the forty-six streets and street segments, or 28.2%, listed in Plaintiffs' Exhibit No. 9, were dead-end streets. In the white community, of the ninety-two streets and street segments listed in Exhibit No. 9, only 9, or 9.7%, were dead-end.

35. Furthermore, the City of Arcadia has arbitrarily and irregularly executed this policy. As a result a discriminatory policy on its face has been implemented in a discriminatory manner.

36. Of the nine dead-end white streets, only three, Hodges (west of Johnson), Crawford and Immogene are unpaved.[4] This amounts to 33.3% of the white dead-end streets as unpaved. In the black community, of the thirteen dead-end streets, seven, or 53.8% are unpaved. In addition, prior to the March 1976 filing of the lawsuit, four additional black dead-end streets, or a total of 84.6%, were unpaved.[5] [Source: (Fact Nos. 34–36), City Map, Defendants' Exhibit No. 4]

37. A comparison of those dead-end streets which were paved in the white community, versus those dead-end streets which were not paved in the black community, shows that a far higher concentration of households existed on the black streets. Thus even within the scope of the City's discriminatory policy to pave dead-end streets last, the decisions of which streets to pave are not fiscally justifiable. In applying the standard engineering cost-efficiency analysis for street paving, the number of households per linear foot of City street, it is clear that the City has benefitted white streets at the expense of black streets. The following table illustrates these facts by listing dead-end streets in both the white and black communities.

4. Other white dead-end streets, all paved, are: Reynolds, Nelson, Lowe, Heard, Oak Ridge, Asbury.

5. Black Dead-End Streets:

| Unpaved | Paved | Paved Since March 1976 |
|---|---|---|
| 1. Hargrave | 1. Watson | 1. Bond |
| 2. N–N–1 | 2. Parker | 2. Owens |
| 3. Madison | | 3. Court (w. of Morqus) |
| 4. Singleton | | 4. Court (w. of Alabama) |
| 5. Citrus | | |
| 6. Tillis | | |
| 7. Dade | | |

## Dead-End -- Black

| PAVED[7] | | | UNPAVED[6] | | |
| ST. (No.) | FT. | HOUSE-HOLDS | ST. (No.) | FT. | HOUSE-HOLDS |
| --- | --- | --- | --- | --- | --- |
| Court (9-B) | 440 | 3 | Hargrave (14-A) | 600 | 4 |
| Court (9-C) | 330 | 3 | N-N-1 | 250 | 9 |
| Watson (34) | 330 | 8 | Citrus (8-A) | 200 | 2 |
| Bond (6-A) | 1050 | 2 | Madison (26-B) | 330 | 9 |
| Owens (20) | 550 | 6 | Singleton (32-A) | 230 | 5 |
| Parker (29) | 660 | 2 | Tillis (33) | 1160 | 13 |
| | 3360 | 24 | Dade ( )[7] | 200 | 1 |
| Households:foot = 1:140 | | | | 2970 | 43 |

Households:foot = 1:64

## Dead-End -- White

| PAVED | | | UNPAVED | | |
| ST. (No.) | FT. | HOUSE-HOLDS | ST. (No.) | FT. | HOUSE-HOLDS |
| --- | --- | --- | --- | --- | --- |
| Oak Ridge (54) | 1320 | 5 | Crawford (9) | 1390 | 2 |
| Asbury (2) | 900 | 3 | Immogene ( )[7] | 300 | 1 |
| Reynolds (63) | 500 | 1 | Hodges ( )[7] | 600 | 1 |
| Nelson (50) | 400 | 5 | | 2290 | 4 |
| Lowe (40) | 660 | 9 | Households:foot = 1:572 | | |
| Heard (28) | 660 | 3 | | | |
| | 4440 | 26 | | | |

Households:foot = 1:170 [Source: Plaintiffs' Exhibit No. 9; Defendants' Exhibit No. 5]

38. The City of Arcadia's policy of making dead-end streets the lowest priority for street paving discriminates against blacks in two ways:

1) There is a far higher percentage of such streets in the black community.

2) The implementation of the policy has been inequitable and discriminatory, serving to exacerbate a system which already burdens the black community unduly.

A higher percentage of white dead-end streets have been paved than black dead-end streets. This has happened despite the fact that on a cost-efficiency basis, the same amount of street paving would bene-

6. Fact No. from Plaintiffs' Exhibit No. 9.

7. From Defendants' Exhibit No. 5.

fit many more households were it constructed on black dead-end streets. [Source: Plaintiffs' Exhibit No. 9; Defendants' Exhibit No. 5 and Testimony of Dyal]

39. The inconsistent, fiscally unsound execution of a discriminatory, though unwritten, policy reviewed above is representative of the City's street paving practices. The City of Arcadia has not formulated, or communicated to its administrator a uniform set of guidelines to use in decisions concerning street paving. Thus all decisions of this nature are left up to the administrator's judgment. Lacking a coherent system for analyzing needed street repairs, designed with the concern for equitable distribution of funds in mind, the Arcadia street paving scheme is inconsistent and discriminates against blacks. Streets are frequently re-sand sealed in the white community before old streets are initially sand sealed in the black community. For example, Luther, Fortune and N.E. Oak Streets in the white community, 4,100 linear feet of street, were re-sand sealed at an approximate cost of $20,500. As additional examples of the discriminatory effect of Arcadia's lack of street paving guidelines, Johnson Street and Kelly Avenue are noteworthy. Johnson Street has three houses spread over 1,300 feet of pavement and does not serve as a access route. Kelly Avenue has one house on 2,500 feet of paved street, and does not serve as an access route. The City Administrator testified he knew of no reason why these streets were paved. The approximate cost of paving these streets was (3,800 lin. ft. × $5) $19,000. [Source: Plaintiffs' Exhibit No. 19, Administrator's progress reports dated June 15, 1976]

40. Quality in pavement surfacing is measured by the thickness of bituminous material, a mixture of tar and sand.

41. Generally, streets in the black community have been paved with the City paving machine which is incapable of putting down a sufficiently thick surface. As a result, streets in the black community are of inferior quality and require more repair and maintenance.

42. In contrast, most white streets are paved with the county's paving machine, which is capable of producing a thicker, higher quality surface. As a result, these streets last considerably longer and require less maintenance than those in the black community. [Source: Testimony of Paller]

## 2. PARK AND RECREATIONAL FACILITIES

43. The two primary standards used in evaluation of respective recreational facilities in the black and white communities are quality and access. Quality is concerned with the kind of facilities respectively in use and their maintenance. Access concerns the relative availability of recreational space and facilities to the respective communities.

44. In examining quality of recreational facilities in Arcadia, the logical comparison focuses on the two large multi-purpose recreational complexes in the City; Smith-Brown, which is black, and Speer, which is white. A review and comparison of these facilities follows.

*—Interiors—*

45. The Smith-Brown center is a converted gymnasium, high ceilinged with basketball courts and a stage. It is essentially one large room that can support few other activities when basketball is being played, which is most of the time. To the side of the basketball court is one pool table and the stage has a ping-pong table. However, the primary function of the center during daytime recreational use, is basketball.

The Speer center is a much more modern building with many rooms to separate different recreational functions. Its main room contains two ping-pong tables. Adjacent rooms contain:

1) Two bumper pool and one pool table;
2) A fully equipped tumbling area;
3) An arts and crafts area;
4) Fully equipped kitchen;
5) A T.V. viewing room; and
6) A meeting room.

The difference in facilities is that Speer is able to support a multitude of recreational activities simultaneously, while Smith-Brown is completely inadequate for such a task. In comparison to Speer, Smith-Brown is not in fact a recreation center, but a converted gymnasium.

### —Exteriors—

46. The land surrounding Speer is excellently maintained, with the grasses kept mowed and the grounds regularly kept clear of debris. The building itself, built of wood and brick, is very well maintained.

The Smith-Brown building's exterior is dramatically different. The building itself is covered with peeling, flaking paint and a thick cover of dirt. The center is adjacent to four abandoned structures that were once a school. They are filled with chipped plaster, exposed wires and assorted debris, especially glass. This debris also covers the grounds adjacent to the buildings. The entire area is unsightly and hazardous and completely unsuitable for a recreational complex. These buildings are technically school board property, but the City has evidenced no serious efforts to either a) clean up the area themselves; b) ask the school board to do so; or, c) condemn the buildings.

### —Ballfields—

47. Speer Recreation Center has a fully equipped, well kept lighted little league softball field, with dugouts, bleachers, backstop, fencing and a building housing concessions and restrooms.

The Smith-Brown field, still in the process of renovation, consists presently of a unfinished field, backstop, fencing and dugouts. There are as yet no lights, equipment storage or bathrooms. The field is not graded, or shaped and lacks bases.

### —Courts—

48. The Speer Center has adjacent to it four recently completed fenced tennis courts, of composition cement surfacing. The Smith-Brown Center has two tennis courts made of less expensive concrete, and two adjacent basketball courts. The courts at Smith-Brown, on Hargrave Street, are not afforded the proximity to restrooms that the courts at Speer enjoy.

### —Play Equipment—

49. Speer Recreation Center has a fully-equipped, fenced "tot lot" with many varieties of play structures for children and shaded sitting areas with picnic tables for adults. The black community has absolutely no facilities for younger children, at Smith-Brown or elsewhere. This is perhaps the most needed recreational improvement in black Arcadia.

### —Access Problems—

50. Speer Recreation Center has no access problems whatsoever, Smith-Brown however has a severe one. Running between the center on Harris Road and the fields and courts on Hargrave is an open drainage ditch. A path between the two areas leads across this ditch, which is a potential health hazard and has been the object of many complaints by the black community. Children crossing the ditch must now step carefully on old tires which sink in the bottom of the ditch. After a rain, crossing is nearly impossible. Minimum health standards would indicate that some sort of simple footbridge be built across it.

51. The question of access to recreational areas and facilities in the black and white communities hinges on the availability of such areas to the highest percentage of the respective racial residential groups.

52. Given that the Smith-Brown and Speer Centers are both in the extreme south and north of the City, respectively, the two parks neutralize each other in comparing access (availability) for black and whites. However, the white community has a total of 3.2 acres of land in seven mini-parks distributed throughout their neighborhoods. These parks afford whites shaded, protected recreational space where families may congregate. No such equivalent spaces exist in the black community. [Source: (Facts 41–50) Testimony of Paller]

53. The Office of Revenue Sharing (herein "O.R.S.") responded to plaintiffs' administrative complaint of discrimination with an investigation of Arcadia's various municipal services. Their investigative team found the City in non-compliance with the anti-discrimination clause of the Revenue Sharing Act due to:

1) the vastly superior maintenance of the Speer Center area, grounds, etc., and;
2) the superior condition of the Speer Center restrooms, and;
3) the health hazard presented by the debris adjacent to Smith-Brown.

The City was directed by O.R.S. to:

1) upgrade restrooms of Smith-Brown equally to those of Speer.
2) request the DeSoto County School Board to either clean up Smith-Brown grounds or ask permission of the board to allow City to do it.
3) adopt a plan to ensure equal maintenance of facilities in the future.

The report was issued March 16, 1977. [Source: Plaintiffs' Exhibit No. 1, Report of Office of Revenue Sharing]

### 3. WATER SYSTEM

54. The existing disparity in the underground water system in Arcadia results from the differences in the quality of the system. Specifically, this means the ability of the distribution system to deliver at each fire hydrant a flow of 500 gallons per minute at a residual pressure of 20 pounds per square inch. This quantity of flow can be provided through either a grid system (intersecting pipes) of 6-inch diameter pipe or a single line 8 inches in diameter or larger. With the exception of four small areas, the entire white community is served by a grid system of 6-inch pipe. The other four areas are adequately served by 8-inch diameter pipe or larger.

55. With the exception of two blocks adjacent to Arcadia's commercial district, the black community does not contain a 6-inch diameter grid system. The 12-inch diameter pipe which passes through the black community distributes water to the commercial area; the 8-inch diameter pipe distributes water to the white community. Except for one other short section of 8-inch pipe, the water system in the black community consists of unlooped 6-inch, 4-inch, 2-inch and smaller diameter pipe; this design and layout will not provide adequate water pressure at fire hydrants. The one in the white community will provide adequate water pressure. Thus, the entire black community suffers from an inferior water quality system.

56. Engineering consultants representing both plaintiffs and the City have agreed on the necessary additional pipe necessary to close the grid system in the black community and thereby increase overall water pressure. They consist of the following additions: (all water pipe recommended to be 6-inch diameter)

| Street | Beginning | Ending | Lin. Ft. of Pipe |
|--------|-----------|--------|------------------|
| Hargrave | Spring | East | 700' |
| Harris | Dade | Orange | 150' |
| Spring[8] | Hargrave | Bay | 2900' |

Source: (Facts 54–56): Testimony of John E. Foster, P.E., plaintiffs' expert witness specializing in civil engineering; analysis of water and wastewater distribution systems.

### E. CONCLUSIONS OF FINDINGS OF FACT

57. The services and facilities provided to the black residents of Arcadia with

---

8. This line is optional if the City does not elect to build a new storage tank on Spring.

respect to street paving, parks and recreation and water supply system are substantially inferior to the provision of these facilities and services to white residents.

58. These inequalities are the result of systematic racial discrimination against the black residents of the town.

59. These inequalities continued up to the date of the filing of this suit.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION, CLASS STATUS AND PARTIES

■ 1. Jurisdiction of plaintiffs' claims with respect to the individually named defendants—the mayor and councilmen—acting in their official capacities, is conferred by 28 U.S.C. § 1331(a) and 1343(3) and (4).

■ 42 U.S.C. § 1983 *et seq.* affords plaintiffs the vehicle to redress violations of constitutional rights, in this case a violation of the Fourteenth Amendment to the United States Constitution, where such rights have been violated by public officials acting in their official capacity under "color of law." *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1967); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, Florida,* 493 F.2d 799 (5th Cir. 1974) and *McGill v. Parsons,* 532 F.2d 484, n. 1 (5th Cir. 1976).

■ 2. § 1983 *et seq.,* while providing a substantive right of action, is not a jurisdictional statute. *Hagans v. Lavine,* 415 U.S. 528, 535, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The "jurisdictional counterpart" for § 1983 is § 1343(3) with jurisdiction recently enlarged to § 1343(4) in 1970, *Lynch v. Household Finance Corp.,* 405 U.S. 538, 543 n. 7, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). § 1331 confers jurisdiction without regard to the amount in controversy, since plaintiffs have alleged and proven an unconstitutional infringement (the Equal Protection Clause of the Fourteenth Amendment) of their right to be free of racial discrimination at the hands of public officials of the City of Arcadia.

■ 3. The defendant City of Arcadia itself is not a "person" within the meaning of 42 U.S.C. § 1983 and thus jurisdiction over the defendant City is not present pursuant to 28 U.S.C. § 1343(3) and (4). *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); and *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ 4. This Court does, however, have jurisdiction over the defendant City of Arcadia under 28 U.S.C. § 1331(a) *City of Kenosha v. Bruno, supra* ; and *Reeves v. City of Jackson,* 532 F.2d 491 (5th Cir. 1976) 28 U.S.C. § 1331(a) confers original federal district court jurisdiction "of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

In the case *sub judice,* all black citizens share in their concern for improved municipal services. The paving of only a portion of an unpaved street fronting one specific black household will not solve that black resident's concern with regard to living on an otherwise unpaved access route. Likewise, other City services which are the subject matter of this suit—water lines and park and recreational facilities—are commonly shared by homeowners living on a particular city block, street, or subdivision. Because of the subject matter of this case, it is impossible to conceive of separate and distinct claims for each black citizen in Arcadia.

■ 5. Jurisdiction of plaintiffs' claim against the individually named defendants for statutory violations under 42 U.S.C. § 2000d et seq. (Title VI of the Civil Rights Act of 1964) and 31 U.S.C. § 1242 State and Local Fiscal Assistance Act of 1972, hereinafter "Revenue Sharing Act") is conferred by 28 U.S.C. § 1343(3) and (4). (Title VI) *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Lemon v. Bossier Parish School Board,* 240 F.Supp. 709 (W.D.La. 1965), aff'd 370 F.2d 847 (5th Cir. 1967) *cert.*

den., 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); (Revenue Sharing) *Robinson v. Simon* and *United States v. Chicago*, 395 F.Supp. 329 (N.D.Ill.1975), 405 F.Supp. 480 (N.D.Ill.1975), 411 F.Supp. 218 (N.D.Ill. 1976), 416 F.Supp. 788 (N.D.Ill.1976), and 420 F.Supp. 733 (N.D.Ill.1976).

6. Jurisdiction of plaintiffs' claims against the defendant City of Arcadia for statutory violations under Title VI of the Civil Rights Act of 1964 and the Revenue Sharing Act is conferred by 28 U.S.C. § 1331. *City of Kenosha v. Bruno, supra; Reeves v. City of Jackson*, 532 F.2d 491 (5th Cir. 1976); and *Mathews v. Massell*, 356 F.Supp. 291 (N.D.Ga.1973).

7. Plaintiffs may properly maintain this action as a class action on behalf of all black persons who reside and will continue to reside in Arcadia, Florida. Rule 23(b)(2), Fed.R.Civ.P. The class which plaintiff represents is so numerous that joinder of all members is impracticable; there are common questions of law and fact applicable to the class; plaintiffs' claims are typical of the claims of the class; plaintiff will fairly and adequately protect the interests of the class. Defendant has acted or refused to act in a manner generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

### B. MUNICIPAL SERVICE DISCRIMINATION

8. The substantive standards imposed by 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to compare municipal service provision between black and white residential communities are essentially established by *Hawkins v. Town of Shaw*, 303 F.Supp. 1162 (N.D. Miss.1969) *rev'd* 437 F.2d 1286 (5 Cir., 1971) *aff'd en banc*, 461 F.2d 1171 (5th Cir., 1972).

9. Once a municipality elects to provide services, it must provide equal services to the minority community or the City violates the Equal Protection Clause.

10. Municipal inaction in response to discrimination in public institutions is violative of the Equal Protection Clause.

11. The standard for service provisions in a municipal service equalization suit is the quality and quantity of services enjoyed by those citizens who are favored by discriminatory practices.

12. The longer the period of time over which it can be established that there have been substantial disparities in the level of municipal services, the greater the presumption that the disparity is a function of race.

13. Citizens have a substantial interest in municipal services and when minority citizens show a statistical pattern of unequal and oppressive distribution of services, a legitimate inference of *de facto* racial discrimination can be drawn.

14. Governmental policies and practices which appear neutral on their face but which have a disparate effect on the minority community are discriminatory.

15. A past history of de jure racial discrimination in the municipality with respect to schools, recreational facilities and other public facilities is persuasive evidence that racial inequalities in the distribution of municipal services is the result of racial discrimination. *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

16. Disproportionate impact may be probative of intent to discriminate and in some cases sufficient to prove intent. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

17. Disproportionate impact of an official action, the legislative or administrative record of the decision are historical background of circumstantial evidence that show intent to discriminate. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

18. Statistical proof coupled with historical showing of broad-based racial discrimination satisfied Plaintiffs' burden of

proving .the intent requirement of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); and *Village of Arlington Heights v. Metropolitan Housing Development, Corp., supra.*

■ 19. To create a presumption of discriminatory purpose the plaintiff must demonstrate that a government decision (a) made a racial classification on its face (b) was applied in a discriminatory manner or (c) had a reasonably foreseeable discriminatory effect. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *United States v. School District of Omaha*, 541 F.2d 708 (8th Cir. 1976) (Omaha II) (en banc) (per curiam).

■ 20. To establish relief under 42 U.S.C. § 2000d et seq. (Title VI) in a municipal services disparity case, it must be proven that a municipality is a recipient of federal financial assistance and that the municipality has used criteria or methods of administration or has selected sites for facilities that have resulted in discrimination in a program or activity supported with federal financial assistance. *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) and *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ 21. Financing discriminatory governmental activities with revenue sharing monies or other federal funds is violative of the Revenue Sharing Act and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. respectively.

■ 22. A municipality or political subdivision may not with respect to any program or activity make selections or locate facilities in places which deny minority individuals the benefits of such facilities and may not use revenue sharing funds to perpetuate the results of past discriminatory practices. Revenue Sharing Act, 31 U.S.C. § 1242.

■ 23. The three essential elements in order for plaintiffs to prove a constitutional violation in municipal service suits, which they have done in this case, are: (1) existence of racially identifiable neighborhoods in the municipality; (2) substantial inferiority in the quality or quantity of the municipal services and facilities provided in the black neighborhood; and, (3) proof of intent or motive.

C. RELIEF

■ 24. Having found that defendants' practices violate plaintiffs' constitutional rights, it is proper for this Court to take remedial action. The well-settled principle that the nature and scope of the remedy is to be determined by the violation means simply that federal court decrees must directly address and relate to the constitutional violation itself. *Milliken v. Bradley*, (Milliken II) 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745, 757 (1977) and *Swann v. Charlotte–Mecklenberg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

25. In this case, a constitutional violation has been found. The remedy which this Court has approved in the Final Judgment does not exceed the violation since the remedy is tailored to cure the "condition that offends the Constitution." *Milliken v. Bradley (Milliken I)*, 418 U.S.C. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) and *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

In the *case sub judice*, as has been shown, the "condition that offends the Constitution" is intentional, systematic across-the-board discrimination relating to certain municipally provided services. A systematic remedy, as provided for in the Final Judgment, cannot "exceed" that violation.

26. The Court commends counsel for the respective parties and the parties themselves. Counsel for plaintiffs has proceeded in this relatively novel action with energy, effectiveness, skill and professionalism. Counsel for defendants has, with complete fidelity to his clients, acted in a competent and professional way.

The citizens of Arcadia, black and white alike, have appreciated and accepted the realities of the law as they have been made apparent and give every indication of cooperating as fellow citizens of what is and can be an attractive community.

By separate instrument the Court is concurrently entering final judgment.

## FINAL JUDGMENT

1. This judgment extends to all issues set forth in the complaint as filed in this matter and to the class of plaintiffs defined as:

All black residents of Arcadia, Florida who are similarly situated and affected by the defendants' policy, practice, custom and usage of racial discrimination in providing municipal services and in the spending of federal revenue sharing funds.

2. This Court has jurisdiction over the subject matter of this action and the parties thereto.

3. The defendants are enjoined from providing municipal services and spending revenue sharing monies in a racially discriminatory manner in violation of the Fourteenth Amendment to the Constitution of the United States, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d–1, 31 U.S.C. § 1242 *et seq.*, and 42 U.S.C. § 1983.

4. A declaratory judgment is entered adjudicating that defendants have violated plaintiffs' right under the Fourteenth Amendment to the Constitution of the United States.

5. Defendants are enjoined from initiating any major service or improvement program in the white residential community until such time as the improvements ordered by this Court for the black residential community are completed; except those items, equipment, improvements, and facilities authorized for expenditure by the Office of Revenue Sharing and consented to and agreed between the parties. The only major improvement program anticipated at this time by the City of Arcadia, Florida will be a Public Safety Complex which shall include, but not be limited to, police and fire protection facilities and administrative office spaces.

6. The Court's previous Order restraining further expenditure of Federal revenue sharing funds by the City of Arcadia be,

and the same is hereby amended and the Federal revenue sharing funds of the City of Arcadia now on deposit and all future revenue sharing funds received by the City of Arcadia be, and the same are hereby released subject to the services, facilities and improvements being made as designated in Appendices A, B and C within the time as specified herein.

That the City of Arcadia shall place in escrow, Federal revenue sharing funds in the amount of $154,863.00 as good faith money to guarantee the construction of the facilities and performance of the services as outlined in Appendices A, B and C.

That any other Federal revenue sharing funds presently on deposit by the City of Arcadia and all future Federal revenue sharing funds be, and the same are hereby released unto the City of Arcadia to be expended as provided by law.

7. Defendants shall make the improvements and/or additions to municipal services provided in black residential areas in the City of Arcadia, Florida, as outlined in Appendices A and B and to accomplish the same shall adhere to the construction, maintenance and finance schedules set forth in Appendices A, B and C.

8. The defendants are required to make a good faith effort to construct the improvements and additions in the manner and engineering design specified in Appendices A and B attached hereto unless good and acceptable engineering practices should dictate otherwise. In the event that defendants decide that said improvements and additions shall be constructed in a manner or engineering design substantially different from that set out in said Appendices, then, such changes shall first be submitted to counsel for plaintiffs for acceptance or rejection. Should plaintiffs' counsel reject such changes, then the matter shall be submitted to this Court.

9. That on or about June 1, 1978 and November 1, 1978, and on the same dates of each year until completion, defendants shall file with the Clerk of this Court and serve upon lead counsel for plaintiffs a report

which sets forth all steps taken to implement and the status of each facet of the programs required by Appendices A, B and C of this judgment.

10. Not later than 30 days after entry of this judgment plaintiffs shall cause to be published in a newspaper of general circulation in the City of Arcadia, Florida a concise summary of this judgment, in a form to be approved by respective counsel. Said summary shall be published for two consecutive weeks, and is to give notice that a copy of this judgment is posted for public inspection at the City Hall.

11. Jurisdiction of this cause is retained for the entry of such further and other orders as may be necessary or required.

12. That all stipulations and agreements entered into between the parties in the trial of this case pertaining to correction of disparity of quality of water service be, and the same are hereby ratified, approved and fully incorporated into the terms and provisions of this Final Judgment.

13. That this judgment is intended to resolve all issues between the plaintiffs and the defendants as these issues are set forth in the pleadings filed in this matter. Upon completion of all projects as specified in Appendices A and B parties shall file a joint motion with this Court to complete active litigation of all the issues in the case. Upon the filing of said joint motion the Court will terminate litigation of this case.

14. Reasonable costs and expenses incurred by plaintiffs in prosecuting this case will be borne by the defendants. Defendants shall immediately upon entry of this Final Judgment reimburse counsel for plaintiffs a sum of money, which has been previously agreed upon by the parties, incurred as reasonable costs in this matter.

15. Plaintiffs, as the prevailing party in this action, are entitled to an award of attorney fees in an amount which has been previously agreed upon by the parties. Defendants shall immediately upon entry of this Final Judgment pay said sum of money to counsel for plaintiffs.

## APPENDIX "A"

### I. ROAD MAINTENANCE

#### A. STREET PAVING

Streets listed below are to be graded and paved with a shell base (minimum six inches compacted to four) and a paved surface which is applied in such a manner that the street has a continuous bituminous surface course of not less than one inch of compacted asphalt that meets Department of Transportation specifications. This work is to be completed within six months from the entry of this Judgment.

| STREET | LENGTH | HOUSE-HOLDS | COST |
|---|---|---|---|
| 1. Ash St.-Singleton Ave. to End | 300 ft. | – | $ 2,000 |
| 2. Citrus Ave.-Bay St. to End | 200 ft. | 2 | 2,000 |
| 3. Dade Ave.-Ash St. to North | 200 ft. | 1 | 2,000 |

## APPENDIX "A"—Continued

I. ROAD MAINTENANCE—Continued

A. STREET PAVING—Continued

| STREET | LENGTH | HOUSE-HOLDS | COST |
|---|---|---|---|
| 4. Garrison Ave.-Between Potter & McKinnley | 200 ft. | 1 | 2,000 |
| 5. Hargrave St.-City Limits to End of Unpaved St. | 600 ft. | 5 | 3,000 |
| 6. Madison St.-Bond Ave. to End | 330 ft. | 9 | 1,650 |
| 7. Marquis St.-Between Court and Gordon St. | 300 ft. | – | 1,500 |
| 8. Myrtle St.-Pine St. to Hector Ave. | 300 ft. | 8 | 3,000 |
| 9. No Name St. #1 | 250 ft. | 9 | 2,000 |
| 10. No Name St. #2 (if easement acquired) | 250 ft. | 3 | 2,500 |
| 11. Pine St.-Between Jordan Ave. and Hector Ave. | 700 ft. | 6 | 4,000 |
| 12. Singleton Ave.-Cul-De-Sac to Bay | 230 ft. | 5 | 1,200 |
| 13. Spring Ave.-Hargrave St. to End | 500 ft. | 4 | $ 4,000 |
| 14. Tillis Ave.-Hector Ave. to End | 1,160 ft. | 15 | 12,000 |
| TOTAL: | 5,520 ft. | | $ 42,850 |

B. EXTENSION OF EXISTING STREETS

Streets listed below are to be graded and paved with a shell base (minimum six inches compacted to four) and a paved surface which is applied in such a manner that the street has a continuous bituminous surface course of not less than one inch of compacted asphalt that meets Department of Transportation specifications. This work is to be completed within six months from the entry of this Judgment.

| STREET | LENGTH | COST |
|---|---|---|
| 1. Extend Singleton Ave. from Cul-De-Sac to Spring Ave. (conditioned upon ability to obtain easement) | 200 ft. | $ 1,000 |

| STREET | LENGTH | COST |
|---|---|---|
| 2. Extend Court Street from Marquis to Alabama | 1,300 ft. | 15,000 |
| a) 300' - new construction (fill in with dirt) add shell, seal, etc. (cost $5,000) | | |
| b) 1,000' - pave previously open and platted unpaved portion of street | | |
| TOTAL: | 1,500 ft. | $ 16,000 |

### C. STREET MAINTENANCE

All streets in the black residential community are to be inspected quarterly. Surface failures are to be corrected within two weeks of the time they are identified, whether the identification is made through the regular inspection programs or through a call from a resident. Whenever the surface becomes rutted and where patching does not restore a smooth surface, the road is to be paved with one inch of asphalt (and with prior grading if necessary) in order to maintain a smooth driving surface.

This activity is to begin immediately. Annual budget for this maintenance is to be $25,000. This amount will allow preparing of approximately 4,000 feet as well as miscellaneous patching costs and manpower.

## APPENDIX "B"

### II. RECREATIONAL FACILITIES

#### A. TOT LOTS

##### 1. TOT LOTS -- LOCATIONS

Tot lots will be installed at the following sites listed below within six months from the entry of this Judgment.

 a. No. #1 - At the Intersection of Harris Road and Madison Avenue on North Side of Harris Road on Property Owned by the City of Arcadia, Florida.

b. No. #2 - On Hargrave Street at Recreation Complex Behind the Existing Basketball Courts on Property Owned by the City of Arcadia, Florida..

c. No. #3 - Defendants have the option of selecting to construct and install one of the following three proposed tot lots. Defendants shall exercise said option at the time of entry of this Judgment and notify plaintiffs, through their counsel of their decision.

(1) Option 1: Northeast Corner of Washington Avenue and Bond Street

(2) Option 2: Southwest Corner of McKinnley Avenue and Harris Road

(3) Option 3: Northwest Corner of Singleton Avenue and Bay Street

2. TOT LOTS -- SPECIFICATIONS

a. Tot Lot No. 1 and No. 2 -- Intersection of Harris Road and Madison Avenue and Hargrave Street Behind Existing Basketball Courts.

| ITEM | | QUANTITY | UNIT PRICE | COST |
|---|---|---|---|---|
| 1. | Galv. Steel Chain Link Fence (48 in. high with one 36 in. gate) | 480 sq. ft. | 3.65 | $ 1,758.00 |
| 2. | See Saw Units | 2 | 225.00 | $ 450.00 |
| 3. | Jungle Jim | 2 | 500.00 | $1,000.00 |
| 4. | Slide (12 ft.L., 6 ft. high) | 2 | 430.00 | $ 860.00 |
| 5. | 6 Ft. Benches/ Steel Supports | 6 | 50.00 | $ 300.00 |
| 6. | Trash Receptacles | 2 | 150.00 | $ 300.00 |
| 7. | Tables, Steel Legs & Wood Slat Tops | 4 | 90.00 | $ 360.00 |
| 8. | Grass Allowance | | | $ 200.00 |
| 9. | Shade Trees (6 Ft. to 8 Ft. high) | 8 | 50.00 | $ 400.00 |

| ITEM | QUANTITY | UNIT PRICE | COST |
|------|----------|------------|------|
| 10. Landscape | | | $ 600.00 |
| 11. Water Fountain | 2 | 150.00 | $ 300.00 |
| TOTAL: | | | $6,528.00 |

b. Tot Lot No. 3 (Upon Defendants Exercising Their Option)

| ITEM | QUANTITY | UNIT (LIN. FT.) |
|------|----------|-----------------|
| 1. Clear underbrush and cut trees | -- | Ea. |
| 2. Galv. Steel Chain Link Fence (48") | 1 | Ea. |
| 3. 36" Gate | 1 | Ea. |
| 4. Sand Pit | 1 | Ea. |
| 5. See-Saw (2 Units) | 1 | Ea. |
| 6. Jungle Jim | 1 | Ea. |
| 7. Merry-Go-Round | 1 | Ea. |
| 8. Slide (12' long, 6' high) | 1 | Ea. |
| 9. Swings (8' high, 4 seats) | 1 | Ea. |
| 10. 6' Bench (Steel supports, hand- wood boards) | 7 | Ea. |
| 11. Trash Receptacles | 2 | Ea. |
| 12. Table (Steel legs, wood slat top) | 1 | Ea. |
| 13. Pavement (allowance) | 67 sq. yds. | Sq. Yd. |
| 14. Grass (allowance) | 170 sq. yds. | Sq. Yd. |

| | APPROXIMATE COST: | $3,500 |
|--|--|--|
| | TOTAL COST OF 3 TOT LOTS: | $10,028 |

B. SMITH-BROWN RECREATION AREA

The Smith Brown Area is to be upgraded in accordance with the specifications detailed herein. The improvements will include all items listed in the detailed cost estimates as outlined in Appendix "B". The total cost of improvements to the Smith Brown Recreation Area are estimated to be $85,985 plus site acquisition costs. It is estimated that work on the Smith Brown Area can be completed within one year after purchase of said property from the District School Board of DeSoto County. It is estimated that work will commence within approximately 30 days from date of closing of the purchase of that property.

The City of Arcadia, Florida will make diligent efforts to complete said projets within the above designated period. If, however, for any unforeseeable reason upon notice to plaintiff's counsel, any of said projects cannot be completed within the time designated, the defendants will furnish to this court at the end of the designated period, a status report showing progress to date on such projects, reason for delay, and the estimated time of completion.

1. GENERAL SITE WORK

| | | |
|---|---|---:|
| a. | Access Road, 250 x 20 (556 sq. yd./$5.00) | $ 2,800 |
| b. | Parking Area, 210 x 70 (1633 sq. yd./$5.00) | $ 8,165 |
| c. | Footbridge | $ 4,730 |
| d. | Electrical | $ 800 |
| e. | Grass Seeding | $ 250 |
| f. | Sidewalk | $ 1,200 |
| g. | Shrubbery | $ 300 |
| | | $ 18,245 |

2. DEMOLITION OF BUILDING A, B, E, AND WALKWAY

| | |
|---|---:|
| Demolish and remove debris – Building A | $ 2,500 |
| Demolish and remove debris – Building B | $ 4,000 |
| Demolish and remove debris – Building E | $ 1,500 |
| Demolish and remove debris – Walkway | $ 500 |
| TOTAL: | $ 8,500 |

## 3. SPECIFIC BUILDING IMPROVEMENTS

### a. BUILDING F; IMPROVEMENTS:

| | | |
|---|---|---|
| Paint Exterior Walls (2 coats) | $ | 500 |
| Replace Broken Windows and Glaze | $ | 300 |
| Upgrade Toilets & Clean Existing | $ | 250 |
| Repair & Upgrade Electrical (Existing) | $ | 200 |
| Kitchen Facilities (Moved to Bldg. C) | | – |
| Athletic Equipment | $ | 500 |
| Misc. Repairs | $ | 500 |
| TOTAL: | $ | 2,250 |

### b. BUILDING C; IMPROVEMENTS:

| | | |
|---|---|---|
| Paint Exterior (2 coats) | $ | 300 |
| Replace or Repair Window Frames | $ | 5,000 |
| Glaze All Windows | $ | 2,000 |
| Replace Floors | $ | 3,000 |
| Repair and Upgrade Electric | $ | 2,000 |
| Install New Doors and Hardware | $ | 1,000 |
| Exterior Seating (6 benches) | $ | 240 |
| Senior Citizens Room (paint and furniture) | $ | 3,000 |
| Community Room (paint and furniture) | $ | 3,000 |
| Kitchen Facilities (moved from Bldg. F) | $ | 2,500 |
| Interior Furnishings | $ | 1,200 |
| TOTAL: | $ | 23,240 |

### c. BUILDING E; IMPROVEMENTS:

| | | |
|---|---|---|
| Demolish and Remove Debris | | |
| Build Three Shuffle Board Courts | $ | 3,000 |
| Strip and Equipment | $ | 300 |
| TOTAL: | $ | 3,300 |

### d. BUILDING D; IMPROVEMENTS:

| | | |
|---|---|---|
| Paint Exterior (2 coats) | $ | 350 |
| Replace or Repair Broken Windows | $ | 2,000 |

| | | |
|---|---|---:|
| Glaze All Windows | $ | 200 |
| Replace Flooring | $ | 1,000 |
| Install New Doors and Hardware | $ | 300 |
| Repair Electric | $ | 500 |
| Install New Plumbing (6 toilets, 4 lavatories, and 2 urinals) | $ | 1,500 |
| New Concrete Block Partitions | $ | 1,000 |
| New Doors and Hardware | $ | 500 |
| **TOTAL:** | $ | 7,350 |

e. BUILDING G; IMPROVEMENTS:

| | | |
|---|---|---:|
| Paint Exterior (2 coats) | $ | 300 |
| Paint Interior (2 coats) | $ | 400 |
| Replace or Repair All Windows | $ | 2,500 |
| Repair and Upgrade Electric | $ | 1,200 |
| Install New Doors and Hardware | $ | 500 |
| Interior Furniture | $ | 1,200 |
| Pool Tables and Equipment (2) | $ | 2,400 |
| Ping-Pong Tables and Equipment | $ | 500 |
| **TOTAL:** | $ | 9,000 |

4. PICNIC AREA

| | | |
|---|---|---:|
| Clear Underbrush | $ | 200 |
| Barbeque Grills (6) | $ | 900 |
| Picnic Tables (12) | $ | 1,600 |
| Trash Receptacles (2) | $ | 400 |
| Horse Shoe Courts (2) | $ | 100 |
| Night Lighting | $ | 300 |
| **TOTAL:** | $ | 3,500 |

5. BASEBALL FIELD

| | | |
|---|---|---:|
| Night Lighting | $ | 5,000 |
| Bleacher Seats | $ | 1,600 |
| Bathrooms and Storage | $ | 3,500 |
| Misc. | $ | 500 |
| **TOTAL:** | $ | 10,600 |

\* \* \*

SMITH-BROWN COSTS:

| | | |
|---|---|---|
| 1. | General Site Work | $ 18,245 |
| 2. | Demolition of Building A, B, E and Walkway | $ 8,500 |
| 3. | Building F Improvement | $ 2,250 |
| 4. | Building C Improvement | $ 23,240 |
| 5. | Building E Improvement | $ 3,300 |
| 6. | Building D Improvement | $ 7,350 |
| 7. | Building G Improvement | $ 9,000 |
| 8. | Picnic Area | $ 3,500 |
| 9. | Baseball Field | $ 10,600 |
| | TOTAL: | $ 85,985 |

C. RECREATIONAL FACILITIES MAINTENANCE

1. Smith Brown Area

A maintenance schedule shall be adopted for the buildings and grounds which provides for periodic maintenance procedures on a daily, weekly, and annual basis. Furthermore, it is important that any substandard conditions be corrected without delay. The following shall be established as the maintenance schedule:

(1) All equipment shall be kept in a safe place but be made easily accessible to the community. Any worn or damaged equipment shall be repaired or replaced without delay;

(2) All areas which are used for recreation shall be free of debris, broken glass, trash and garbage;

(3) All floor surfaces shall be cleaned regularly and especially after heavy usage or special events;

(4) Trash and refuse must be taken away at least once a week;

(5) All toilets, showers and drinking fountains shall be cleaned at least once a week;

(6) All wall surfaces, interior and exterior, shall be kept clean and painted. Any areas

which show deterioration or defacement
shall be patched up or completely re-
painted, whichever is necessary;

(7) All electrical fixtures, including
lights, shall be kept in operable con-
dition. All bulbs and other equipment
shall be replaced immediately as needed;

(8) Buildings shall be kept waterproof. The
roofs shall be repaired or replaced with-
out delay as needed. All windows shall
be operable, as intended, and have the
glass panes in good order. Any damage
or wear to windows shall be corrected by
repair or replacement.

The responsibility for inspection of the facilities and
equipment shall be equally shared by the Smith Brown Recrea-
tion Director and the municipality. In addition, a list of
all maintenance activity shall be kept separately by both
the park district and the center director to record the
frequency and the type of work carried out.

B. Tot Lots

Maintenance of the tot lots shall include:

(1) All areas in and around the enclosed tot
lots shall be free of debris, broken glass,
trash and garbage;

(2) Trash and refuse must be taken away at
least once a week;

(3) All equipment including benches and fencing
shall be repaired or replaced as needed
without delay. All equipment is to be main-
tained in good working order.

The responsibility for the monthly inspections of all
tot lots and equipment belongs to the municipality.

APPENDIX "C"

TOTAL COSTS OF

ALL PROJECTS

I. ROAD MAINTENANCE

A. Street Paving $ 42,850

B. Extensions $ 16,000

II. RECREATIONAL FACILITIES

 A. Tot Lots $ 10,028

 B. Smith Brown $ 85,985

 TOTAL
 COSTS: $ 154,863